```
                                                    ┌──────────────────────────────┐
                                                    │ USDC-SDNY                    │
                                                    │ DOCUMENT                     │
                                                    │ ELECTRONICALLY FILED         │
UNITED STATES DISTRICT COURT                        │ DOC #:_____        │
SOUTHERN DISTRICT OF NEW YORK                       │ DATE FILED: 3/14/14          │
-----------------------------------------------X    └──────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
                                                :
MISSIONARY-TRACEY ELAINE BLAIR,                 :
                                                :
                                    Plaintiff,  :
                                                :                No. 12 Civ. 8615 (RA)
            -v-                                 :
                                                :                OPINION AND ORDER
INSIDE EDITION PRODUCTIONS,                     :
                                                :
                                    Defendant.  :
                                                :
---------------------------------------------------------X

RONNIE ABRAMS, United States District Judge:

    *Pro se* Plaintiff Tracey Elaine Blair brings this defamation action against Defendant

Inside Edition, Inc., alleging that a series of broadcasts on Inside Edition's televised news

program injured her reputation by publicizing numerous false statements concerning her

occupancy of the house of her former landlord, Heidi Peterson, while Peterson was out of the

country. Inside Edition moves for summary judgment on the ground that all of the statements at

issue are substantially true. The Court grants the motion, as no rational jury could find by clear

and convincing evidence that any of the statements is false.[1]

## BACKGROUND[2]

    Blair is a self-proclaimed politician and "public figure" who advocates for affordable

---

[1] Rather than submitting an opposition to the motion for summary judgment, Blair submitted two
discovery-related motions. The Court addresses these motions, both of which are denied, in
Section II of the opinion. "[T]he failure to oppose a motion for summary judgment alone does
not justify the granting of summary judgment." Vermont Teddy Bear Co., Inc. v. 1-800
Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). The Court "must still assess whether the
moving party has fulfilled its burden of demonstrating that there is no genuine issue of material
fact and its entitlement to judgment as a matter of law." Id.

[2] The facts recited below are drawn from Blair's deposition, the parties' exhibits, and
Defendant's Rule 56.1 Statement of Material Facts ("Def. 56.1"), which Blair has not opposed.

housing in Detroit and, in particular, the reclamation of abandoned homes.  (Def. 56.1 ¶ 5; Blair

Dep. 41:13-15; Def. Ex. 1 ¶¶ IV, V.)  She has run for a number of offices as a write-in candidate,

including mayor of Detroit, state senator, governor of Michigan, and president of the United

States.  (Def. 56.1 ¶ 4.)  In addition, she has used her adverse possession of vacant residential

properties as the basis for at least four quiet title actions.  (Id. ¶ 6.)

From October 2010 through February 2011, Blair rented a room in Peterson's home

pursuant to a month-to-month lease.   (Def. 56.1 ¶¶ 9-10.)  Peterson served Blair with a notice to

quit on February 14, 2011, claiming that the house had to be vacated because the boiler was

broken.  (Id. ¶ 11.)  After Blair moved out, Peterson changed the locks and left the country.  (Id.

¶¶ 12-13.)  Blair paid no further rent and had no contact with Peterson while she was abroad.

(Id. ¶¶ 12, 14.)  After moving out of Peterson's home, she resided with her mother and sister and

in another house that she purchased for $3,000.  (Blair Dep. 10:22-12:10, 154:14-57:21.)

In April or May of 2012, Blair was driving by Peterson's house and decided to attempt to

retrieve certain possessions that she had left there.  (Id. at 45:3-25.)  She discovered that the door

was broken and that the neighbors had not seen Peterson recently.  (Id. at 46:3-7.)  Over the next

few months, Blair installed a new lock on the front door, scraped and repainted the walls, fixed

the plumbing, and replaced the refrigerator and stove, all without Peterson's permission.  (Id. at

75:6-10, 78:2-79:2, 93:8-99:4, 149:4-20.)

On June 1, 2012, Blair filed a quiet title action for possession of the property, naming

Peterson as the defendant.  (Def. 56.1 ¶¶ 21-22.)  Later that month, she filed a complaint to

encumber the property with a construction lien for the repairs that she had made.  (Id. ¶ 24.)   By

July, she began to live there, alternating between Peterson's house and her other two residences.

(Blair Dep. 62:21-63:20.)  She obtained a default judgment against Peterson in the amount of

$8,500 on October 11, 2012.  (Def 56.1 ¶¶ 25-26.)

Blair returned to the house on October 8 or 9, 2012 to discover Peterson on the porch with police officers.  (Id. ¶¶ 30-31.)[3]  The police left after Blair showed them her construction lien pleadings.  (Id. ¶¶ 32-33.)  Detroit's local Fox Television Stations affiliate, Fox 2, interviewed Blair and Peterson regarding the incident and broadcast a report on October 9, 2012.  (Id. ¶¶ 40-43.)  After the broadcast, several news outlets sought interviews and reported on the dispute.  (Id. ¶¶ 44-45.)

*Inside Edition*, the televised newsmagazine of Inside Edition, Inc., aired four segments about the dispute on October 11, 12, 13, and 19, 2012.  (Id. ¶¶ 1, 46-50.)  A voiceover in the first broadcast introduces the situation as follows:  "You've never seen an odd couple like this.  They're not roommates, but they live in the same house.  And Heidi Peterson says she wants her outta there.  She says Tracey Blair is a squatter and has no right to be there.  But Tracey refuses to move."  (Def. Ex. A at 1:33-47.)  Blair and Peterson are shown arguing about the appliances that Blair removed or replaced, and Peterson says, "You can't just do things with people's items that don't belong to you."  (Id. at 2:00-16, 2:30-35.)  The voiceover explains that, "for now, Tracey and Heidi and her little daughter will have to co-exist under the same roof, possibly for many months to come, until this bizarre situation is worked out," and Peterson is shown saying, "I want to resolve this in court."  (Id. at 2:50-3:01.)  The broadcast concludes with the anchor's explanation of eviction law:  "Under the law, a homeowner cannot remove a squatter by force, so Heidi actually has to file a civil suit in court, prove it's her property, and then evict the alleged squatter.  It is a process that could take the better part of a year."  (Id. at 3:02-15.)

---

[3] Blair suggested at her deposition that Peterson might have returned on October 10.  (Blair Dep. 102:18-25.)  However, as the Fox 2 report was broadcast on October 9, (Def. Ex. 6), Peterson must have been back by then.

The second broadcast is a viewer reaction segment.  (Def. 56.1 ¶ 47.)  The anchor quotes comments from viewers and states that "most viewers are outraged that Detroit homeowner Heidi Peterson must now go to court to remove Tracey Blair from her own home."  (Def. Ex. B at 15:41-47.)

The third broadcast, which appeared on *Inside Edition*'s weekend show, similarly characterizes Blair as a squatter and describes Blair and Peterson as "absolute strangers."  (Def. 56.1 ¶¶ 48-49; Def. Ex. C at 0:05-07.)  The anchor states that Blair "insists she will not leave until the law forces her out" and, as in the first broadcast, reports that, "under the law, a homeowner cannot remove a squatter by force, so Heidi actually has to file a civil suit in court, prove that it is her property, and formally evict the alleged squatter—a process that could take a year."  (Def. Ex. C at 0:13-17, 1:52-2:05.)

The last broadcast, aired on October 19, is entitled "Moving Day."  (Def. 56.1 ¶ 50.)  The anchor begins by reporting that, "though the alleged squatter refused to leave, she is now finally packing her bags."  (Def. Ex. D at 14:42-46.)  Blair is shown moving boxes out of the house, and the voiceover explains that "the bizarre living situation has been going on for weeks, with the two squabbling just like Felix and Oscar on the classic TV series, *The Odd Couple*."  (Id. at14:47-15:35.)

Blair does not know precisely when she moved out of Peterson's house, but she viewed at least one of the broadcasts on the television set at the house and therefore could have left no earlier than October 12, 2012.  (Def. 56.1 ¶¶ 34-35, 38.)  At the request of the reporters, she returned to the house to retrieve her belongings.  (Id. ¶ 39.)

Blair took no further action concerning the default judgment, but she also made no application to lift the lien.  (Id. ¶ 27; Blair Dep. 83:22-84:9.)  Peterson moved to vacate the

judgment and dismiss the action on November 26, 2012, and her motion was granted on December 19, 2012.  (Def. 56.1 ¶¶ 27, 29.)  A few days before Peterson filed her motion, she filed a petition for a personal protection order prohibiting Blair from entering her home or "kidnapping Sarah Kathryn Peterson," Peterson's daughter.  (Def. Ex. 18.)  She also filed a complaint against Blair and Blair's contractor on January 22, 2013, claiming that they had damaged the property and caused her serious emotional distress and other harm.  (Def. Ex. 17.)

Blair commenced this defamation action against Inside Edition on November 27, 2012, seeking $200,000 in damages and an injunction prohibiting Inside Edition from publishing the broadcasts.  (Def. Ex. 1 ¶ V.)  Her complaint alleges that the broadcasts "slandered [her] character by publicizing [her] as an unwanted squatter in a house where Miss Peterson was forced to live alongside a stranger."  (Id. ¶ III(C).)  Counsel for Inside Edition deposed Blair on May 17, 2013.  (Def. 56.1 ¶ 53.)  On the same day, the Court granted Inside Edition's motion to bifurcate discovery, to stay discovery unrelated to the truth or falsity of the broadcasts, and to entertain a motion for summary judgment on substantial truth.  (Def. Ex. 16 at 4, 12.)

## STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute over a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  Otherwise, there is "no issue for trial."  Id. at 249.

The first question the Court must address is which party bears the burden of proof with respect to the truth or falsity of the statements at issue.  "Although truth is a matter of affirmative

defense under the common law of defamation, a public figure plaintiff or private figure plaintiff involved in a matter of public concern has the burden to establish falsity." Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc., 844 F.2d 955, 958 n.5 (2d Cir. 1988) (citing Garrison v. Louisiana, 379 U.S. 64, 74 (1964) and Phila. Newspapers, Inc. v. Hepps, 475 U.S. 767, 774-78 (1986)).  This requirement is of constitutional significance, as it is designed to mitigate the "chilling" effect of defamation law on speech protected by the First Amendment.  See Hepps, 475 U.S. at 776-77.  Conversely, "[t]here is some authority for the proposition that the general rule at common law, that falsity is presumed and that defendants must bear the burden of pleading and proving truth, survives in defamation suits by private-figure plaintiffs concerning statements on purely private matters."  Albert v. Loksen, 239 F.3d 256, 268 n.10 (2d Cir. 2001).

"Whether a plaintiff is a public figure is a question of law for the court."  Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 176 (2d Cir. 2000).  "We evaluate whether a party is a public figure based on 'clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society.'"  Dongguk Univ. v. Yale Univ., 734 F.3d 113, 123 (2d Cir. 2013) (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 352 (1974)).  "Those who have voluntarily sought and attained influence or prominence in matters of social concern are generally considered public figures."  Celle, 209 F.3d at 176.  In addition, a private-figure plaintiff is involved in a matter of public concern if the speech at issue "is related to a 'matter of political, social, or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'"  Dongguk Univ., 734 F.3d at 129 (quoting Snyder v. Phelps, 131 S. Ct. 1207, 1216 (2011)).

In her complaint, Blair avers that she is a "public figure" by virtue of her missionary work and candidacy for president of the United States.  (Def. Ex. 1 ¶¶ IV, V.)  Indeed, Blair has

run as a write-in candidate for, among other offices, mayor of Detroit, state senator, governor of Michigan, and president of the United States.  (Blair Dep. 178:22-79:3, 183:2-22, 191:12-21, 192:23-93:15.)  In addition, Blair testified at her deposition that she is "well-known in [her] community as a housing advocate" and is "well-known generally in [her] community."  (Id. at 203:3-11.)  She further testified that she has given numerous television interviews on housing and that an Illinois state court had deemed her to be a "public figure."  (Id. at 210-15.)  It is apparent that Blair has sought influence in matters of social concern, and she certainly does not dispute that she has attained it.  As a public figure, Blair bears the burden of proving falsity.  See Celle, 209 F.3d at 177 (upholding the district court's finding that the plaintiff was a public figure "[g]iven [the plaintiff's] own characterization of himself as a 'well known radio commentator' within the Metropolitan Filipino-American community").[4]

The standard for assessing falsity is informed by the "common law of libel[,] . . . . [which] overlooks minor inaccuracies and concentrates upon substantial truth."  Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516 (1991).  A statement is true "so long as 'the substance, the gist, the sting, of the libelous charge be justified.'"  Id. at 517.  "Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'"  Id.

The Supreme Court has not yet expressed a view on "whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence."  Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 661 n.2 (1989).  Nor has the Second Circuit articulated the appropriate standard of proof.  See DiBella v. Hopkins, 403 F.3d 102, 111

---

[4] Alternatively, the Court finds that the broadcasts touch on issues of public concern.  Both the presence of a "squatter" in an ostensibly abandoned house and the legal process required to evict such a person are subjects of legitimate news interest.

(2d Cir. 2005) (declining "to address this open question in federal constitutional law").

The Court need not decide this question. "Because this is a diversity case," the Court applies "federal procedural law" and "state substantive law," as modified by the constitutional rules discussed above. In re Fosamax Products Liab. Litig., 707 F.3d 189, 193 (2d Cir. 2013) cert. denied, 133 S. Ct. 2783 (2013). The elements of Blair's defamation action derive from state law, and the only two plausible candidates are New York (where Inside Edition is domiciled) and Michigan (where Blair is domiciled and the events at issue took place). Under the choice-of-law rules of New York, which apply here, the Court may dispense with a choice-of-law analysis if there is no actual conflict between New York law and Michigan law. See Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998).[5] Both New York and Michigan go beyond the constitutional minimum and require public figures to demonstrate falsity by clear and convincing evidence. See DiBella, 403 F.3d at 111 (New York); Phillips v. Ingham Cnty., 371 F. Supp. 2d 918, 929-30 (W.D. Mich. 2005) (Michigan).[6] In addition, both states hold defendants "to a standard of

---

[5] The Court notes that "[a]s a first approach to the choice of law problem in libel actions New York assumes that the state of the plaintiff's domicile will usually have the most significant interest in the case and that its law should therefore govern." Celle, 209 F.3d at 175.

[6] Neither the New York Court of Appeals nor the Michigan Supreme Court appears to have definitively addressed this issue. Nevertheless, the Second Circuit has stated that "(1) the uniform view of the New York Appellate Divisions, (2) the majority view of other jurisdictions (both state and federal), (3) the fact that the clear and convincing evidence standard has already been incorporated into the New York Pattern Jury Instructions, and (4) scholarly writing in this field" constitutes "significant and persuasive evidence from which to conclude that the New York Court of Appeals would hold that falsity must be proved by clear and convincing evidence." DiBella, 403 F.3d at 115. The same sources, supplemented by decisions of the Michigan Court of Appeals, inform this Court's conclusion with respect to Michigan law. See, e.g., A-Mac Sales & Builders v. Detroit News, Inc., No. 247582, 2004 WL 2192641, at *3 (Mich. Ct. App. Sept. 30, 2004) (requiring "clear and convincing evidence of actual falsity"); Kefgen v. Davidson, 617 N.W.2d 351, 359 (Mich. Ct. App. 2000) ("A public figure claiming defamation must prove by clear and convincing evidence that the publication was a defamatory falsehood and that it was made with actual malice through knowledge of its falsity or through reckless disregard for the truth.").

substantial, not literal, accuracy." Law Firm of Daniel P. Foster, P.C., 844 F.2d at 959 (New York); see also Nichols v. Moore, 477 F.3d 396, 399 (6th Cir. 2007) (Michigan).

Summary judgment is therefore warranted if no reasonable jury could find by clear and convincing evidence that the statements at issue are substantially false. See Anderson, 477 U.S. at 252 (holding that "the inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits"). This is "a demanding standard, the most rigorous burden of proof in civil cases." Matter of Westchester Cnty. Med. Ctr. on Behalf of O'Connor, 531 N.E.2d 607, 613 (N.Y. 1988); see also In re Martin, 538 N.W.2d 399, 410 (Mich. 1995). Clear and convincing evidence has been defined as evidence that "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." In re Martin, 538 N.W.2d at 410 (quoting Matter of Jobes, 529 A.2d 434, 441 (N.J. 1987)) (alterations in original); see also People v. C.M., No. 22/2008, slip op. at 5 (N.Y. Sup. Ct. March 31, 2009). In short, the evidence must "satisf[y] the factfinder that it is highly probable that what is claimed actually happened." In re Gail R., 891 N.Y.S.2d 411, 414 (2d Dep't 2009).

## DISCUSSION

Inside Edition is entitled to summary judgment on Blair's defamation claim because no rational jury could find by clear and convincing evidence that the statements at issue are false.

## I. Inside Edition's Motion for Summary Judgment

### A. The Statement that Blair is a "Squatter"

Blair asserts that the broadcasts defamed her by calling her a "squatter." (Blair Dep.

215:24-216:4.)  No reasonable jury could conclude, however, that this characterization was substantially false.  According to Blair, a "squatter" is "[s]omeone who goes into a property that belongs to someone else."  (Id. at 38:10-12.)  A more precise definition might be "[a] person who settles on property without any legal claim or title."  Black's Law Dictionary (9th ed. 2009).  In either case, the label is substantially true.  Peterson served Blair with a notice to quit and changed the locks to her home before leaving the country.  (Blair Dep. 73:21-75:4.)  Blair subsequently returned to Peterson's house and lived there for at least three months without permission, title, or payment of rent.  (Id. at 62:17-63:24.)  Moreover, Blair changed the refrigerator, plumbing, and stove, and even attempted to gain title to the house by adverse possession.  (Id. at 50:7-51:7, 64:2-8, 94:8-11, 149:4-20.)

During her deposition, Blair claimed that she had a valid lease agreement because "a month-to-month never expires."  (Id. at 63:10.)  This is incorrect.  In Michigan, a landlord may terminate a month-to-month lease by giving one month's notice to the tenant.  See Mich. Comp. Laws Ann. § 554.134(1); Ypsilanti Hous. Comm'n v. O'Day, 618 N.W.2d 18, 21 (Mich. Ct. App. 2000).  Peterson served the notice to quit on February 14, 2011, and Blair vacated the premises at some point that month.  (Blair Dep. 73:12-75:4, 135:13-18.)[7]

By identifying evidence in the record that supports the notion that Blair was a squatter, Inside Edition made its *prima facie* case for summary judgment.  See Golden Pac. Bancorp v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004).  It was then incumbent on Blair to come forth with admissible evidence from which a reasonable jury could find by clear and convincing evidence that she had a legal claim to occupy Peterson's house.  See id.  She has not done so.  Inside Edition's motion is therefore granted with respect to the description of Blair as a "squatter."

---

[7] There is no allegation that Peterson's notice to quit provided Blair with insufficient time to depart or that Blair did not leave within a month of her own accord.

Even if the "squatter" label were literally false, it would not "have a different effect on the mind[s] of [Inside Edition viewers] from that which the pleaded truth would have produced." Masson, 501 U.S. at 517 (internal quotation marks omitted). A technical deficiency in Peterson's notice to quit would not alter the fact that Blair vacated the premises, reentered without permission when Peterson was absent, and treated it as her own property for months until Peterson's unexpected return. This is the "substance" or "gist" of the allegation that Blair was a squatter, and it is substantially true.[8]

## B.   The Statement that Blair is a "Stranger" to Peterson

Blair also takes issue with the repeated statement that she and Peterson were "strangers" during the time that Blair occupied Peterson's house without permission. (Blair Dep. 216:11-15.) Inside Edition concedes that this statement is not literally true. It contends, however, that the description of Blair and Peterson as "strangers" does not alter the substantial truth of the statement that Blair was a "squatter" and is not independently susceptible of defamatory meaning.[9] The Court agrees.

---

[8] Blair also claimed that she had a right to stay in the house because Peterson had not gone to court to evict her. (Blair Dep. 141:8-16, 142:2-6.) Peterson, however, had no reason to seek a court order after Blair had already moved out, and, in any event, the absence of eviction proceedings does not suggest that Blair had a valid lease. Nor was the lease resurrected by the fact that Blair had left personal possessions in the house. (Id. at 138:12-17.)

[9] When considered in isolation, the statement that Blair and Peterson were "strangers" cannot possibly be defamatory. See Kevorkian v. Am. Med. Ass'n, 602 N.W.2d 233, 236 (Mich. Ct. App. 1999) ("A communication is defamatory if, considering all the circumstances, it tends to so harm the reputation of an individual as to lower that individual's reputation in the community or deter third persons from associating or dealing with that individual."); Golub v. Enquirer/Star Grp., Inc., 681 N.E.2d 1282, 1283 (N.Y. 1997) ("Generally, a written statement may be defamatory 'if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community.'") (quoting Mencher v. Chesley, 75 N.E.2d 257, 259 (N.Y. 1947)). The claim that Blair was "squatting" on the property of a complete "stranger" could, however, have a defamatory connotation. The Court therefore analyzes the substantial truth of this claim.

Although Peterson and Blair knew each other before the events reported in the broadcasts, no reasonable jury could find that this fact would have materially altered viewers' perceptions in Blair's favor.  The existence of a prior landlord-tenant relationship does little to justify Blair's actions.  And, while some viewers may have been unsettled by Blair's supposedly random choice of dwelling, others would be similarly unsettled by the notion of a disgruntled or opportunistic former tenant.  As the "sting" of the inaccurate statement is the same as that of the truth, it cannot support an action for defamation.  See Masson, 501 U.S. at 517; Guccione v. Hustler Magazine, Inc., 800 F.2d 298, 302 (2d Cir. 1986) (finding that labeling the plaintiff an adulterer was not substantially false even though "'former long-time adulterer' would have been more precise").

**C.  The Description of Blair's Conflict with Peterson**

Blair further claims that it was defamatory for the broadcasts to say that she was "arguing" with Peterson  (Blair Dep. 221:13-17.)  Even if this statement were susceptible of defamatory meaning, it is literally true, as the broadcasts show just that—Blair and Peterson arguing about Blair's modifications to Peterson's house.  (Def. Ex. A at 2:07-15, 2:30-36, 2:47-50; Def. Ex. D at 15:35-57.)  Similarly, Blair argues that it was defamatory to say that she caused Peterson "anxiety and frustration."  (Blair Dep. 225:18-22.)  No reasonable jury could view the broadcasts and fail to conclude that Peterson appears anxious and frustrated.  (Def. Ex. A at 2:30-36; Def. Ex. D at 15:44-57.)  Her anxiety is also apparent from the fact that she has sought a restraining order against Blair and has filed suit against her and her contractor for property damage and emotional distress.  (Def. Ex. 17; Def. Ex. 18.)  These statements are at the very least substantially true and do not warrant a defamation trial.

**D.  The Description of Blair and Peterson as America's New "Odd Couple"**

Blair also objects to the broadcasts' characterization of her and Peterson as America's new "Odd Couple."  (Blair Dep. 224:11-20.)  This allusion to the famous television series is not actionable.

The First Amendment shields from state defamation law those "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual."  Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990) (alteration in original).  "This provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation."  Id.  The "dispositive question" is "whether a reasonable factfinder could conclude that the statements [here] imply an assertion that . . . . is sufficiently factual to be susceptible of being proved true or false."  Id. at 21.

Neither the comparison of Blair and Peterson to bickering television characters nor the subjective judgment that their situation is "odd" is capable of being proved true or false.  The First Amendment thus forbids liability on the basis of those statements.  Furthermore, Blair's interpretation of the term "Odd Couple" as racist, (Blair Dep. 216:3-25, 219:4-13), is not one that a reasonable jury could share.  There is simply nothing in the broadcasts that suggests that what is "odd" about the situation is based at all on Peterson or Blair's race.  The broadcasts plainly use the term "odd couple" to make light of Peterson's exasperating cohabitation with her former tenant and alleged squatter, rather than to criticize interracial cohabitation.

**E.  The Claim that Blair Refuses to Leave Peterson's Home**

As Inside Edition acknowledges, Blair contends that the broadcasts defamed her by repeatedly "claiming that she was unwilling to leave Peterson's home."  (Def. Mem. 9-10; Blair Dep. 221:7-11, 222:18-23:4.)  Although Inside Edition fails to address these statements in its

briefs, it is nonetheless entitled to summary judgment.[10]

The first broadcast claims that "[Blair is] not moving out unless an incredibly slow legal process forces her to" and goes on to explain that, "[u]nder the law, a homeowner cannot remove a squatter by force, so Heidi actually has to file a civil suit in court, prove it's her property, and then evict the alleged squatter.  It is a process that could take the better part of a year."  (Def. Ex. A  at 1:26-29, 3:02-15.)  The second broadcast reports that "most viewers are outraged that Detroit homeowner Heidi Peterson must now go to court to remove Tracey Blair from her own home."  (Def. Ex. B at 15:41-47.)  The third states that Blair "insists she will not leave until the law forces her out" and also suggests that protracted eviction proceedings will be necessary. (Def. Ex. C at 0:13-17, 1:52-2:05.)  While the last broadcast depicts Blair "finally packing her bags," it first observes that she initially "refused to leave."  (Def. Ex. D at 14:42-46.)

According to Blair, it was always her intention to leave the house if Peterson returned. (Blair Dep. 49:6-11.)  She testified that she "c[ould]n't quiet title the house if [Peterson] is back" and that she was "happy to . . . leave th[e] house" because she was "living [t]here to prevent [others] from breaking in further."  (Id. at 44:25-45:2, 116:15-21, 117:2-15.)  She further testified that Peterson never asked her to leave, that she "d[id]n't want . . . to force [her]self on [any]one," and that she left the house after finding out how the various news reports had portrayed her intentions.  (Id. at 134:2-8, 143:21-24.)  When asked three times at her deposition whether she had "asked [Peterson] for a couple of months to get [her] stuff together before [she] left," Blair insisted that she had not and that she had told the Inside Edition reporters no such

---

[10] "District courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*. . . . 'so long as the losing party was on notice that [it] had to come forward with all of [its] evidence.'"  First Fin. Ins. Co. v. Allstate Interior Demolition Corp., 193 F.3d 109, 114-15 (2d Cir. 1999) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986)) (alterations in original).  Here, Inside Edition plainly stated its intention to seek summary judgment as to "every statement the Plaintiff challenges."  (Def. Mem. 10.)

thing.  (Id. at 223:5-23.)

The record does not permit a rational jury to find by clear and convincing evidence that the statements in the broadcasts are substantially false.  Blair's claim that she was willing to leave immediately is contradicted by the fact that she did not initially move out upon Peterson's arrival.  (Def. 56.1 ¶¶ 34-35, 38.)  Indeed, when confronted by a Fox 2 reporter, Blair said, "I have a construction lien for the repairs that I put into the house," (Def. Ex. 6 at 0:56-59), suggesting that she felt entitled to stay there.  In addition, when the reporter said that Peterson had told her that "you said that you have the right to live here," Blair responded, "I have a lease with her since October 2012."  (Id. at 1:09-16.)

Moreover, at the time, Peterson was clearly under the impression that Blair would not leave or relinquish her claim to the house.  When asked in her Fox 2 interview whether she felt safe living with Blair, Peterson replied, "I don't know what the capabilities are.  We're afraid of her mindset of entitlement."  (Id. at 3:26-33.)  She went on to say, "I thought, if the house is not safe, how can I come here with my child?  There's an issue with that.  But should I lose my house to a squatter because I don't have rights to my property or should I fight to get it back?"  (Id. at 4:07-19.)[11]

On this record, a reasonable factfinder could not "come to a clear conviction, without hesitancy," that the statements at issue are false.  In re Martin, 538 N.W.2d at 410.  Although it is possible that Blair had no intention of staying at Peterson's house if she were unwanted, the

---

[11] "The principles governing admissibility of evidence do not change on a motion for summary judgment," Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997), and "[n]ewspaper articles are usually inadmissible hearsay," Mandal v. City of New York, No. 02 Civ. 1234 (WHP), 2006 WL 3405005, at *1 (S.D.N.Y. Nov. 26, 2006).  However, as statements "offered against an opposing party," Blair's statements are not hearsay.  Fed. R. Evid. 801(d)(2).  Moreover, Peterson's statements fall under the hearsay exception for "statement[s] of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)."  Fed. R. Evid. 803(3).

Supreme Court has made clear that "where the scales are in such an uncertain balance, . . . the Constitution requires us to tip them in favor of protecting true speech." Hepps, 475 U.S. at 776. As Blair has not met her burden, summary judgment is appropriate.

## II.  Blair's Motions and Exhibits

Although Blair did not respond directly to Inside Edition's motion for summary judgment, she submitted a "Motion for Discovery or Deposition by Telephone Pursuant to Federal Procedure Section 26:471," a "Motion to Strike Change to Deposition Given by Defendant; for Plaintiff, Pursuant to Federal Procedure § 26:477," and thirteen exhibits.

Blair's first motion, dated July 6, 2013, does not request any information in particular and appears instead to be an application to appear by telephone at a discovery conference that was scheduled for July 12, 2013.  (Dkt. 40 at ¶ 5.)  As the conference was canceled, (Dkt. 37), the motion is denied as moot.

The second motion claims that although Blair received CD copies of the broadcasts from Inside Edition, her computer was unable to "record" them.  (Dkt. 41 at ¶¶ 3-4, 9.)  Blair admits, however, that Inside Edition arranged for her to view the broadcasts at the offices of a Detroit law firm and that she did in fact watch them there.  (Id. at ¶¶ 5-6; see also Dkt. 37 at 2-3.)  The remaining allegations in the motion are either immaterial to the substantial truth of the broadcasts or simply reiterate the allegations in Blair's complaint.

Lastly, the Court has reviewed with care the thirteen exhibits Blair has submitted and concludes that they fail to create any genuine issue of material fact.

## CONCLUSION

For the foregoing reasons, Inside Edition's motion for summary judgment is granted, and Blair's motions are denied.

The Clerk of Court is respectfully requested to terminate the motions pending at docket numbers 24, 40, 41, and 42 and close the case.

SO ORDERED.

Dated:      March 14, 2014
            New York, New York

Ronnie Abrams
United States District Judge